IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DENISE SAMUELS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 13-cv-155-CJP[1] |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Denise Samuels seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in May, 2009, alleging disability beginning on April 2, 2009.  (Tr. 13).  After holding an evidentiary hearing, ALJ Paul F. Kelly denied the application on August 25, 2011.  (Tr. 13-25).  The Appeals Council denied review, and the decision of the ALJ became the final agency decision.  (Tr. 1).  Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 12.

Plaintiff raises the following interrelated points:

1.    The ALJ erred failing to incorporate all limitations found by Dr. Klug into his RFC assessment.

2.    The ALJ failed to explain why he rejected part of the opinion of Dr. Klug, a consultative examiner.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C. §423(d)(3).**  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

determine whether a claimant is disabled.    The Seventh Circuit Court of Appeals

has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is

presently unemployed; (2) whether the claimant has an impairment or combination

of impairments that is serious; (3) whether the impairments meet or equal one of

the listed impairments acknowledged to be conclusively disabling; (4) whether the

claimant can perform past relevant work; and (5) whether the claimant is capable of

performing any work within the economy, given his or her age, education and work

experience.    **20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513**

**(7th Cir. 2009.**

If the answer at steps one and two is "yes," the claimant will automatically be

found disabled if he or she suffers from a listed impairment, determined at step

three.    If the claimant does not have a listed impairment at step three, and cannot

perform his or her past work (step four), the burden shifts to the Commissioner at

step five to show that the claimant can perform some other job. ***Rhoderick v. Heckler***, **737 F.2d 714, 715 (7th Cir. 1984).** ***See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.   Thus, this Court must determine not whether Ms. Samuels was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   **See,** ***Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995**)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).**   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   ***Brewer v. Chater*,**

4

**103 F.3d 1384, 1390 (7th Cir. 1997)**.   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Kelly followed the five-step analytical framework described above.   He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date.   He found that she had severe impairments of substance abuse, dysthymic disorder, hypertension, and decreased vision, and that these impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Samuels had the residual functional capacity (RFC) to perform work at the light exertional level, with a number of physical and mental limitations.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work.   She was, however, not disabled because she was able to do other jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff.   As plaintiff has not challenged the ALJ's findings as to her physical impairments, the Court will not summarize that evidence in any detail.

1.     **Agency Forms**

Plaintiff was born in 1960, and was 49 years old on the alleged onset date. (Tr. 243).   She was 5 feet tall and weighed 150 pounds.   (Tr. 247).   She stopped working in April 2, 2009.   She described this as a "no call no show termination." (Tr. 248).

Plaintiff worked in the past as a food preparer in the health care industry, a self-employed babysitter, and a welder for a steel company.   (Tr. 249).   She completed the 10th grade.   (Tr. 252).

## 2.    Evidentiary Hearing

Ms. Samuels was represented by an attorney at the evidentiary hearing on June 16, 2011.   (Tr. 47).

Plaintiff testified that she could not work because she did not like people and did not get along with them.   (Tr. 52).   She also said she had been trying to find a job, but "they act like they don't hire black people."   She believed she could work as a cook.   (Tr. 53).   She had applied at nursing homes, a hospital and McDonalds.   (Tr. 57).   She was fired from her last job as a dietary aide in a hospital because she woke up late and called in late.   (Tr. 57-58).

She was recently hospitalized after a suicide attempt.   She had been seeing a psychiatrist, Dr. Habib, since January.   He prescribed medication for her.   She was not better, and she still cried every day.   The medications did help some.   (Tr. 60-63).   She found it hard to get along with people because she had "that mouth that nobody likes to be around."   She got in a lot of fights with people.   (Tr. 67). She had been fired from two jobs for fighting.   (Tr. 72).   She heard voices at night and saw "shadows."   (Tr. 73).

6

Ms. Samuels used marijuana about a week before the hearing.   She testified that she did not "really smoke it, because I can't afford to."   She smoked marijuana about four times in the past year.   She drank about a six-pack of beer a day on the weekends.   (Tr. 83-85).   She later testified that, up until April of 2011, she was smoking marijuana every day.   She cut down on the amount of beer that she drank beginning in May, 2011, because of lack of money.   (Tr. 93-95).

Dr. Reid, a clinical psychologist, testified as an independent medical expert based on a review of the records.   (Tr. 77-78).   He testified that plaintiff had been diagnosed with major depression, recurrent, severe, without psychosis, and cannabis abuse.   Her impairments did not meet or equal a Listing.   He testified that the objective medical evidence did not establish a major depressive disorder. Rather, he felt she had an adjustment reaction secondary to job loss in January, 2011.   He opined that her present diagnosis was low-level dysthymic disorder which was "probably substance-induced."   (Tr. 90-95).

A vocational expert (VE) also testified.   The ALJ asked the VE a series of hypothetical questions.   The transcript is somewhat difficult to follow because of the manner in which the ALJ switched back and forth between the assumptions of the hypothetical questions.   (Tr. 100-106).   One of the questions comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the light exertional level, with some physical and mental limitations.   The mental limitations were as follows:

- Only simple, routine, repetitive tasks;

- No fast-paced production requirements;

- Only simple work-related decisions;

- Few, if any, workplace changes;

- Only occasional interaction with the public; and

- Only occasional interaction with co-workers.   (Tr. 102).

The VE testified that this person could not do any of plaintiff's past work, but there were other jobs in the economy which she could do.   Examples of such jobs are garment or clothing bagger and wrapper.    (Tr. 104-106).

Plaintiff's counsel then questioned the VE regarding a limitation in ability to respond appropriately to usual work situations.   The VE testified that, at the unskilled level, a worker is given very little leeway in responding appropriately to work situations.   He said that a worker who responded inappropriately to work situations once a month would not be able to maintain employment.   (Tr. 106-109).

### 3.    Mental Health Treatment

Ms. Samuels called her primary care physician's office on January 12, 2011, seeking a referral to a psychiatrist.   She said that she felt depressed and sometimes she wanted to kill herself.   She was told to go to the emergency room immediately.   (Tr. 552).

She went to the emergency room on the same day.   She said she had suicidal thoughts.   She had lost her job a few months earlier, and had feelings of hopelessness, worthlessness, anger and agitation.   She was hospitalized at Gateway Regional Medical Center from January 13 to January 19, 2011.   It was noted that she had psychiatric treatment in the past and had taken Paxil and Zoloft.

A drug screen was positive for marijuana, but she denied regular use.   During this hospitalization, Ms. Samuels came under the care of Dr. Arif Habib, a psychiatrist. The diagnoses were (1) major depressive disorder, recurrent, severe, without psychosis, and (2) cannabis abuse.   At discharge, she was alert and oriented, cooperative, and denied any suicidal or homicidal ideation.   She had no hallucinations and no symptoms of mania.   (Tr. 372-375).

Following her discharge from the hospital, plaintiff saw Dr. Habib four times through the date of the hearing.   He noted that Ms. Samuels reported hearing voices or noises at times.   He reported basically normal findings on mental exams, except that Ms. Samuels was depressed and crying in February, 2011.   Her medications were adjusted on the first three visits.   (Tr. 699-717).   On the last visit, in June, 2011, Ms. Samuels reported that she was doing "fair."   Mental status exam was normal.   Her medications were not changed at that visit.   (Tr. 720-722). Dr. Habib's records do not include an assessment of plaintiff's functional capacity.

### 4.      Examination by Dr. Klug

Fred D. Klug, Ph.D., performed a consultative examination of plaintiff and prepared a report at the request of the agency on April 26, 2011.   She had mental health treatment in 1994 which included psychiatric hospitalizations, outpatient therapy and psychotropic medications.   She reported "flashbacks" to being molested as a child.   She admitted drinking alcohol on weekends and using marijuana.   She last used marijuana about a week earlier.   On exam, Dr. Klug found that her immediate and short term memory was impaired, but long term memory was intact.   Reasoning and abstract thinking were poor.   Ability to do

9

simple calculations was fair.   Judgment and insight were poor.   It appeared that her intellectual functioning was borderline.   Her thought processes were goal-directed and relevant.   She had no delusions, obsessions or compulsions. She reported feeling depressed and having suicidal and homicidal ideation/behavior.   Dr. Klug observed that her affect was "labile (tearful) and consistent with her thought content."   Dr. Klug's Axis I diagnosis was dysthymic disorder – late onset.   (Tr. 691-694).

Dr. Klug also completed a form furnished to him by the agency entitled "Medical Source Statement of Ability to Do Work-Related Activities (Mental)."   This form asked the doctor to rate Ms. Samuels' abilities in a number of areas using a five-point scale.   The points on the rating scale are none, mild, moderate, marked and extreme.   Mild is defined as "There is a slight limitation in this area, but the individual can generally function well."   Moderate is defined as "There is more than a slight limitation in this area but the individual is still able to function satisfactorily."

Dr. Klug indicated that she had moderate limitations in ability to interact appropriately with the public, supervisors and co-workers, and ability to respond appropriately to "usual work situations and to changes in a routine work setting." As support for these ratings, he wrote "low tolerance for stress + emotional lability is apt to interfere with social interactions."   (Tr. 695-697).

## Analysis

ALJ Kelly gave Dr. Klug's opinion "great weight as he examined the claimant and his opinion is consistent with the medical evidence as a whole."   See, Tr. 22.

Plaintiff argues that the ALJ erred in failing to either account for all limitations found by Dr. Klug or give a good reason for omitting some limitations.

The ALJ noted that Dr. Klug found that Ms. Samuels had a moderate impairment in her ability to interact appropriately with the public, co-workers and supervisors, and in her ability to respond appropriately to usual work situations and to changes in a routine work setting.   See, Tr. 22.   His RFC assessment limited plaintiff to simple, routine, repetitive tasks with no fast paced production requirements; only simple work-related decisions; few, if any, work place changes; and only occasional interactions with the general public and co-workers.   Plaintiff argues that the RFC assessment did not account for her moderate limitations in interacting with supervisors and in responding appropriately to usual work situations.

RFC is "the most you can still do despite your limitations."   20 C.F.R. §1545(a).   In assessing RFC, the ALJ is required to consider all of the claimant's "medically determinable impairments and all relevant evidence in the record." *Ibid*.   Further, where the ALJ relies upon the testimony of a VE at step five of the sequential analysis, he must "orient the VE to the totality of a claimant's limitations."   ***O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010)**. The "most effective way" to do that is to include all of plaintiff's limitations in the hypothetical question posed to the VE.   ***Ibid.***

The RFC assessment did not include any limitation regarding interaction with supervisors, as opposed to co-workers and the general public.   Such a limitation was not mentioned to the VE.   However, in the back-and-forth between

11

the ALJ and the VE, the VE sought clarification.   He asked, "We have limited contact with people, right?"   The ALJ replied, "Yes. Occasional, yes."   (Tr. 104).

The Commissioner argues that the RFC and hypothetical question were sufficient because "co-workers" should be understood to include "supervisors." She offers no authority for this position, and does not argue that it was a position specifically espoused by the ALJ.   The language used by the agency in regulations and other publications does not support it.   Rather, the agency generally identifies responding appropriately to supervisors/supervision as an element distinct from responding appropriately to co-workers.   For instance, 20 C.F.R. §404.1521(b) gives examples of "basic work activities."   Among the examples are "[r]esponding appropriately to supervision, co-workers and usual work situations."   In SSR 85-15, the agency describes the basic mental demands of unskilled work as "the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."   SSR 85-15, 1985 WL 56857, at *4.   Perhaps most tellingly, even the agency form furnished to Dr. Klug distinguished between supervisors and co-workers.   The form asked the doctor to rate ability to interact appropriately with supervisors separately from ability to interact appropriately with co-workers.   See, Tr. 696.   Thus, the Court sees no reason to assume that the ALJ intended the term "co-workers" to include "supervisors."

The Commissioner argues that, if the ALJ did not intend "co-workers" to include "supervisors," any error was harmless because the VE understood that the

12

examining psychologist found that plaintiff had limitations with both supervisors and co-workers, and the VE understood that the hypothetical question limited contact with "people."   The Court is not persuaded.   The hypothetical question explicitly asked about co-workers and the general public.   It is too large a leap to assume that the VE understood that the ALJ meant that plaintiff had a limitation with regard to interacting with supervisors when the ALJ never mentioned such a limitation.   Further, the record contains no indication that the VE would have testified in the same way had he known that plaintiff was limited to only occasional interaction with supervisors as well as with co-workers and the general public.

The second aspect of plaintiff's argument is that the ALJ failed to account for her moderate limitation in ability to respond appropriately to usual work situations.   While the RFC assessment and the hypothetical question included a limitation to few, if any, work places changes, neither contained an explicit limitation with regard to responding appropriately to usual work situations.

The Commissioner argues that the ALJ translated the moderate limitation in responding to usual work situations into restrictions on the "nature of the usual work situations that Samuels could experience, as well as a limitation on the frequency of workplace changes she could tolerate."   Thus, according to the Commissioner, the ALJ intended the other mental limitations he specified to cover the limitation on responding to usual work situations, which he did not specify. This ingenious argument fails for two reasons.

First, the ALJ did not say that he intended the articulated mental limitations to account for plaintiff's moderate limitations in responding to usual work

13

situations.   In advancing a reason not relied upon by the ALJ, the Commissioner violates the **Chenery** doctrine.   See, **SEC v. Chenery Corporation, 318 U.S. 80 (1943)**.   "Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace."   **Kastner v. Astrue, 697 F.3d 642, 648 (7th Cir. 2012).**

The second problem with the Commissioner's argument is that it does not logically follow from the record.   The mental limitations assigned by the ALJ in his RFC and in the hypothetical question logically account for Dr. Klug's findings that Ms. Samuels had moderate limitations with regard to complex instructions and decisions, interacting with the public and co-workers, and responding appropriately to changes in a routine work setting, as well as her low tolerance for stress.   However, there is no limitation assigned by the ALJ which logically accounts for a restricted ability in dealing with usual work situations.

The Commissioner's argument is, in effect, that the ALJ sufficiently accounted for her limitation in dealing with usual work situations by accounting for her *other* mental limitations.   This argument reduces the limitation in responding appropriately to usual work situations to mere surplus.   Again, however, the form provided to Dr. Klug by the agency as well as 20 C.F.R. §404.1521(b) and SSR 85-15 list dealing with usual work situations as an item separate and distinct from the other mental work-related activities.   There is no reason, based on the language used by the agency or on the ALJ's own words, to assume that limitations designed to account for restrictions in other areas of mental functioning also serve to account for the limitation in responding to usual work situations.

14

The VE testified that an unskilled worker would be given very little leeway in responding appropriately to usual work situations.   Plaintiff's counsel asked him whether a person who failed to respond appropriately to a usual work situation "on even a once-a-month level" could maintain employment.   The VE answered in the negative.  (Tr. 109).   Thus, the VE's testimony established that a limitation in ability to respond appropriately to usual work situations is potentially dispositive on the question of disability.   The ALJ was required to either account for plaintiff's limitation in this area in his RFC assessment and hypothetical question, or explain why he rejected Dr. Klug's opinion on this issue.   See, **Beardsley v. Colvin, ___ F.3d ___, 2014 WL 3361073, *4 (7th Cir. 2014)**("[R]ejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled . . . can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step.")

Lastly, the Court notes the Commissioner's argument that a moderate limitation, as defined by the agency's form, means that the person can still function satisfactorily in the area.   It is true that the form defines moderate as "more than a slight limitation in this area but the individual is still able to function satisfactorily." (Tr. 695).   Again, the Court must point out that ALJ Kelly did not say that he omitted any reference to a limitation in responding appropriately to usual work situations because a moderate limitation means that plaintiff can still function satisfactorily in that area.   He saw fit to specify limitations in other areas where Dr. Klug found moderate limitations, but did not explain why he failed to include limitations in interacting with supervisors and dealing with usual work situations.

15

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Samuels is entitled to social security disability benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves that issue to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Denise Samuels' application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   July 28, 2014.**


                                        s/ Clifford J. Proud
                                        CLIFFORD J. PROUD
                                        UNITED STATES MAGISTRATE JUDGE